**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-22-172** |
| | * | |
| **THOMAS PATRICK CONNALLY, JR.,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, hereby submits the Government's Memorandum in Aid of Sentencing and Response to Defendant's Sentencing Memorandum. Defendant Thomas Patrick Connally, Jr. ("Connally") is scheduled to be sentenced on August 4, 2022, at 11:30 a.m. For the reasons set forth below, the Government submits that a sentence of **46 months in prison, followed by 3 years of supervised release**, is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing.

**I.     Background**

On July 26, 2021, the Defendant was charged via criminal complaint with Threats Against a Federal Official, in violation of 18 U.S.C. § 115(b)(4), and Interstate Communication Containing a Threat to Harm, in violation of 18 U.S.C. § 875(c). (ECF No. 1.) The Defendant had his initial appearance on the criminal complaint on July 28, 2021. (ECF No. 4.) The Defendant was detained by U.S. Magistrate Judge Timothy J. Sullivan and subsequently this Court pending trial. (*See* ECF Nos. 10, 18, 36, 47.) On May 4, 2022, Connally was charged via Information with Threats Against a Federal Official, in violation of 18 U.S.C. § 115(a)(1)(B). On May 23, 2022, the Defendant plead guilty to the one count in the Information. (ECF No. 54.) After accepting the Defendant's

plea and adjudging him guilty, the Court scheduled sentencing for August 4, 2022, at 11:30 a.m. (ECF No. 57.)  The Court directed the U.S. Probation Office ("Probation") to prepare the Pre-Sentence Investigation Report, which was filed on June 28, 2022, with an amended version filed on July 22, 2022.  (ECF No. 33; ECF No. 64 ("PSR").)

Pursuant to a written plea agreement entered on May 23, 2022, the parties agreed that for the threats against Dr. Anthony Fauci the base offense level was **12**.  (ECF No. 55 ("Plea") ¶ 6(a).) A **2**-level increase applied because the offense involvement more than two threats.  (*Id.* ¶ 6(b).)  A **6**-level increase applied because the victim was a government officer or employee or a member of the immediate family of a government officer or employee and the offense of conviction was motivated by such status.  (*Id.* ¶ 6(c).)  Therefore, the total offense level for the threats against Dr. Fauci (Group One) was **20**.  The same total offense level applied, respectively, for the threats against Dr. Francis Collins (Group Two) and Dr. Rachel Levine (Group Three).  (*Id.* ¶¶ 6(d)-(i).) For the threat against Individual B (Group Four), the base offense level was **12** and a **6**-level enhancement applied because the victim was a government officer or employee or a member of the immediate family of a government officer or employee and the offense of conviction was motivated by such status.  (*Id.* ¶¶ 6(j)-(k).)  For the threats against Religious Leader A (Group Five), the base offense level was **12** and a **2**-level increase applied because the offense involvement more than two threats.  (*Id.* ¶¶ 6(l)-(m).)  Following the application of the grouping principles set forth in the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), the total offense level was **24**.  (*Id.* ¶¶ 6(n)-(o).)  The Government did not oppose a **2**-level reduction for acceptance of responsibility, and the Government agreed to move for an additional **1**-level reduction in recognition of the Defendant's timely notification of his intention to enter a plea of guilty.  (*Id.* ¶

6(p)).  The final offense level is therefore **21**.  Probation's calculation of the applicable Guidelines and final offense level of **21** is the same.  (PSR ¶¶ 27-64.)

The parties did not reach agreement as to the Defendant's criminal history.  The Government agrees with Probation's calculation that the Defendant's criminal history score is **0** and his criminal history category is therefore **I**.  (PSR at 21.)  The Guidelines prescribe a sentence in the range of 37 months to 46 months.  (*Id.*)

## II.    <u>Legal Standard</u>

In *United States v. Green,* 436 F.3d 449 (4th Cir. 2006), the Fourth Circuit held that after *United States v. Booker,* 543 U.S. 220 (2005), which made the Sentencing Guidelines effectively advisory, the district court is commanded to fulfill congressionally established objectives for sentencing set out in 18 U.S.C. § 3553(a): promoting respect for the law; providing just punishment for the offense; affording adequate deterrence; protecting the public from further criminal activity of the defendant; providing the defendant training, medical care, and correctional treatment; and providing restitution to victims.  *See Green,* 436 F.3d at 455; *see also United States v. Moreland,* 437 F.3d 424, 432 (4th Cir. 2006).

Thus, in conducting a sentencing, district courts must (1) calculate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the statutory sentencing factors set out in 18 U.S.C. § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guidelines range better serves the relevant statutory sentencing purposes.  *See Green,* 436 F.3d at 455-56; *Moreland,* 437 F.3d at 432.  The explanation of a variant sentence must be tied to the factors set forth in § 3553(a) and must be

accompanied by findings of fact as necessary.  *See Green,* 436 F.3d at 455-56; *United States v. Perez-Pena,* 453 F.3d 236, 241 (4th Cir. 2006).  The district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances.  *Green,* 436 F.3d at 456-57; *Moreland,* 437 F.3d 433.

III.   **Relevant Sentencing Considerations Under 18 U.S.C. § 3553(a)**

Over the course of nine months the Defendant conducted a campaign of terror, sending emails containing threats of serious bodily injury and death to his five victims.  For the emails sent to Drs. Fauci, Collins, Levine, and Individual B, the Defendant's goal was the same—to retaliate against these health officials because he disagreed with their performance of their official duties to combat the COVID-19 pandemic and to thus intimidate them from further performing these official duties.  These individuals were not the Defendant's first or only victims, which included a religious leader and a prominent Iranian-American television host.  Smart and technologically sophisticated, the Defendant intended to heighten the terror he sought to instill by using a foreign encrypted email provider.  Using this provider also allowed the Defendant to hide his identity and continue to send his threatening emails unabated.

The Defendant researched names and email addresses for individuals affiliated with his victims—especially when he could not find a public email address—to ensure that the victims received his threats, asking their co-workers or subordinates to communicate his threats to the intended victim.  As he escalated his threats, the Defendant also researched the names of family members for some of his victims and named them in his threats—employing graphic language to describe the serious bodily injury and death he intended to inflict on them.  These volleys of threatening emails sent repeatedly by the Defendant for over nine months with the combination of (i) an anonymous email account; (ii) frequent, prolonged, heinous, and graphic threats of violence

4

and death; and (iii) the inclusion of information about the victim's family members had in all one purpose only—to make his victims feel helpless and instill in them fear and anxiety for their safety and the safety of their loved ones.

A.     Connally's Nine Month Terror Campaign

On November 24, 2020, the Defendant sent a series of six emails in the span of approximately fifteen minutes to Dr. Rachel Levine, then Secretary of Health for the state of Pennsylvania. (Ex. 1.)  The Defendant threatened that he would enact violence against the former Secretary of Health and that he sought to kill—"eliminate" in his words—Dr. Levine.  (*Id.* at 6.) The Defendant's threats to Dr. Levine were sent one day after Dr. Levine in her then role as Secretary of Health announced a variety of restrictions to mitigate the spread of COVID-19.  *See* Pennsylvania Governor's Office, "As COVID-19 Cases Reach Critical Levels, Wolf Admin Announces New Mitigation Efforts," (November 23, 2020), https://www.governor.pa.gov/newsroom/as-covid-19-cases-reach-critical-levels-wolf-admin-announces-new-mitigation-efforts/.

To send his threats, the Defendant used an encrypted email account with a foreign email provider.  The Defendant had other email accounts in his own name.  The Defendant had two additional email accounts with the foreign email provider—both in his own name.  (*See* Ex. 2 (email the defendant sent to himself from one of his email accounts with the foreign email provider to an email account with a U.S.-based email provider, listing the usernames and passwords for his accounts with the foreign email provider) (under seal).)  The Defendant also had an email account with a U.S.-based email provider, which also used his full name as part of the email address.  (*See id.*)  Knowing that these email accounts could be linked back to him because of their use of his name or that the email provider was based in the United States, the Defendant instead chose to use

his anonymous email account with the foreign provider to make sure that his threatening emails could not be traced to him.  As the Defendant told one of his associates, he used this foreign encrypted email provider because it fell "under Swiss privacy laws" and had "[f]ull end-to-end encryption."  (Ex. 3 (under seal).)  The Defendant knew that sending his threatening emails from an anonymized encrypted email account with a foreign email provider would provide him the best opportunity to conceal his identity and terrorize his victims with impunity.

The threats to Dr. Levine in November 2020 were not the first threats this Defendant sent. On August 7, 2019—months before the beginning of the COVID-19 pandemic—a prominent Iranian-American religious, scholar, writer, and television host posted on his Twitter account an email containing a threat that he had received from the Defendant's anonymized encrypted foreign email address.  (Ex. 4 (under seal).)  Approximately a year later, on June 29, 2020, using his U.S.-based email account in his name, the Defendant sent an email containing a threat to the public email address of the President of the European Commission.[1]  (Ex. 5 (under seal).)  Subsequently, two months later, on August 31, 2020, the Defendant sent an email to Individual A—the Director of Communications for the Massachusetts Department of Public Health—a message containing a threat of physical violence and death for Individual B, the Massachusetts Department of Public Health Director.  (Ex. 6 (under seal).)  Contrary to his statements in his sentencing memo, his letter to the Court, and to his forensic psychologist, the Defendant was not merely writing and sending his threatening emails into the ether or to unattended email addresses.  The Defendant found the publicly available email address for the Director of Communications to guarantee his threat was communicated through Individual A to Individual B—the intended target.  (*Id.*)  The Defendant's

---

[1] On March 19, 2021, an online reporter in Shasta County, California, also received a death threat from the Defendant, which she posted on her website.  (Ex. 14 (under seal).)

actions to send his threatening email were deliberate and planned and the email was sent with the intent that it would reach and terrorize his target.

On December 28, 2020, the Defendant sent his first two emails to Dr. Fauci, in which he threatened Dr. Fauci with serious bodily injury and death. (Ex. 7 at 1-2 (under seal).) To ensure that his threats reached their intended target, on the first of these emails the Defendant copied an epidemiologist from a university in London, U.K., and three other officials at the National Institutes of Health ("NIH"). (*Id.* at 1.) Addressing his email to "Dr. Fauci," the Defendant wanted to make sure that the recipients of his email knew who he was targeting and that these threats would again reach the intended victim. (*Id.*) In his second email, the Defendant told Dr. Fauci that "you will wish you were dead when I'm finished bludgeoning your disgusting elf freemason [*sic*] skull into the pavement." (*Id.* at 2.) The day before the Defendant sent these two emails, Dr. Fauci had appeared on television to discuss taking the first shot of the COVID-19 vaccine, describe his concerns regarding a COVID-19 surge, and ask individuals to stay at home to mitigate the surge. *See* People, "Dr. Anthony Fauci Says He Had No Side Effects After Receiving First Dose of Moderna COVID-19 Vaccine," (December 27, 2020), https://people.com/health/dr-fauci-no-side-effects-moderna-coronavirus-vaccine/. The Defendant intended that these emails containing vivid imagery of bodily injury and death would intimidate or interfere with Dr. Fauci's engagement in his official duties and to retaliate against Dr. Fauci for discussing COVID-19 and its testing and prevention.

On April 24, 2021, the Defendant sent Dr. Fauci and Dr. Collins a series of emails threatening emails. (Ex. 7 at 3-9 (under seal); Ex. 8 (under seal).) A day before these emails, CNN had published an interview in which Dr. Collins discussed the need for COVID-19

vaccinations among the general population.[2]   CNN, "US has the opportunity to overcome the Covid-19 pandemic but a major challenge lies ahead, expert says," (April 23, 2021), https://www.cnn.com/2021/04/22/health/us-coronavirus-thursday/index.html.  In response to this, the Defendant threatened Dr. Collins to "[d]rop the 'mandatory vaccine' talk . . . or you're getting 6 mandatory shots . . ." and "Your daughters will be hunted, captured, tortured and shot in the back of the head if you say one more word about 'mandatory vaccines' . . ."  (Ex. 8 at 1, 3 (under seal).)

Escalating the terror he sought to inflict on his victims, the Defendant sought out the names of Drs. Fauci and Collins' immediate family members and included them in his threats.  (Ex. 7 at 7-9 (under seal); Ex. 8 at 3 (under seal).)  The emails contained graphic threats of gun violence, physical beatings, torture, arson, and death against Drs. Fauci and Collins and their families.  This was no mere attempt for the Defendant to vent his frustrations about his mother's living conditions or the COVID-19 pandemic.  Emboldened by his anonymized encrypted email account, the Defendant took premeditated actions prior to communicating his threats—researching his victims—with the sole purpose of causing substantial harm and fear to Drs. Fauci and Collins and retaliating against them for their role in the COVID-19 pandemic response.

Approximately a month later, on May 27, 2021, the Defendant sent Dr. Fauci an email with the subject line, "Cutting your scalp off and sewing it onto a rat."  (Ex. 7 at 10 (under seal).)  Following his threats against Dr. Fauci, the Defendant included an article from that month regarding Dr. Fauci's alleged involvement in controversial medical research—evidencing the precipitating reason why the Defendant sent the threatening communication to his victim.  (*Id.*)

---

[2] The same day, Dr. Fauci and other physicians provided a press briefing at the White House discussing the COVID-19 response and the need for vaccinations.  *See* The White House, "Press Briefing by White House COVID-19 Response Team and Public Health Officials," (April 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/04/23/press-briefing-by-white-house-covid-19-response-team-and-public-health-officials-31/.

Subsequently, on July 21, 2021, the Defendant sent two emails to Dr. Fauci stating in unequivocal terms the Defendant's intent to inflict serious bodily harm and death on Dr. Fauci and his family.[3] (*Id.* at 11-12.)   Finally, four days later, on July 25, 2021, and two days before his arrest, the Defendant sent his final threatening email to Dr. Fauci, informing his victim that he would "pay with [his] blood."[4]  (*Id.* at 13.)  The Defendant intended these threats to intimidate or interfere with Dr. Fauci's engagement in the performance of his official duties and to retaliate against Dr. Fauci for performing his official duties regarding COVID-19 testing and prevention.

During the course of this campaign of terror the Defendant also targeted a religious leader in New Jersey.  (Ex. 9 (under seal).)  Once again unable to find an email address for Religious Leader A, the Defendant targeted employees at the religious institution—sending five emails—to ensure that his threats of serious bodily injury and death reached his intended victim.  (*Id.*)

B.      The Necessity for the Requested Sentence

From August 2020 to his arrest in July 2021, the Defendant sent at least twenty-eight emails to his victims, threatening them, and in some cases their family members, with serious bodily injury or death.  The time period, volume of emails, the Defendant's use of an anonymized encrypted email account, and the number of victims and family members he targeted demonstrate the seriousness of this offense.

---

[3] A day before this email, Dr. Fauci had appeared on Capitol Hill for a hearing on the COVID-19 pandemic.  *See* CNN, "Fauci and Rand Paul have terse exchange: 'You do not know what you are talking about'," (July 20, 2021), https://www.cnn.com/2021/07/20/politics/anthony-fauci-rand-paul-debate/index.html.

[4] Again, a day before this email, Dr. Fauci had conducted interviews stating that the number of COVID-19 cases was rising and that vaccinated individuals wearing masks was under "active consideration."  See CNN, "Fauci: 'We're going in the wrong direction' on Covid-19 cases," (July 25, 2021), https://www.cnn.com/2021/07/25/politics/anthony-fauci-covid-19-unvaccinated-cnntv/index.html.

i.      *Seriousness of the Offense*

As the Government has set forth, contrary to the Defendant's assertions, this was not a victimless crime—as the Defendant well knew.  The Defendant sought out his victims by researching contact information for them—whether they were public figures or health officials. When the Defendant could not find a way to directly communicate his threats to his victims, he contacted their co-workers in order for his threats to have their maximum effect and ensure that they reached his intended target. (*See, e.g.,* Ex. 6 (under seal); Ex. 7 at 1 (under seal); Ex. 9 (under seal).)  The Defendant wanted his threats to be seen and read by his victims.  When he felt that his threats were not having the intended effect of intimidating his victims, he escalated his conduct and researched the victims' family members—significant others and children—and not only included their names in his threats, but in fact threatened these family members with horrific acts of violence.  (Ex. 7 at 7-9 (under seal); Ex. 8 at 3 (under seal).)  All of this demonstrates that the Defendant was not merely sending emails he thought would never be seen or read—copying co-workers and including the names of loved ones in fact evidences the opposite.  The purpose of these nonstop threatening emails—sent repeatedly and in volume—was to terrorize his victims. Similarly, the Defendant chose to send his intimidating and terrorizing emails from an anonymized email account, using that anonymity to heighten the terror he caused his victims while also allowing him to evade identification by law enforcement for a significant period of time, so that he could continue to engage in his campaign of terror against his victims.

The enhancement for multiple threats set forth under the Guidelines does not adequately capture the severity of the criminal conduct undertaken by this Defendant—affording only a 2-level enhancement when a Defendant sends more than two threats.  U.S.S.G. § 2A6.1(b)(2)(A). To Dr. Fauci and his family alone, this Defendant sent thirteen emails containing threats of serious

physical violence or death—sending approximately twenty-eight threatening emails to all of the victims over nine months. *See United States v. Stovall*, 817 F. App'x 205, 207 (6th Cir. 2020) (noting that the defendant's dozens of threats far exceeded the minimum for the two-level enhancement for multiple threats and considering that an appropriate basis for an upward variance); *United States v. Pitts*, 592 F. App'x 531, 533 (8th Cir. 2014) (affirming district court's significant upward variance where two-level enhancement for more than two threats did not fully capture the offense based on defendant's relentless threats, "threaten[ing] to take her children, blow up her place of work, and set her on fire.")

The Defendant's emails themselves communicated explicit threats of death and harm through beatings and torture.  Telling his victims that they would "pay with [their] childrens' blood," (Ex. 7 at 11 (under seal)), that their children would "have their skulls smashed with crowbars," (Ex. 8 at 4 (under seal)), or that their daughters "[would] be tied to trucks and have their arms and legs ripped off" while the victim watches, (Ex. 8 at 3 (under seal)), was not mere "'roasting'" or "[t]rangressive language" as the Defendant now proposes, (Def.'s Ex. A at 2). These emails were sent with the very purpose of instilling fear and communicating terror not only to the recipients of these emails, but also to and on behalf of the family members mentioned in these emails.  The submitted victim impact statement shows that the Defendant's many threats had the intended effect against both the victim and their family members, including producing fear for the recipient's own safety, "a chronic state of anxiety" that the victim and their family members felt after being subject to these threats, and the need to seek additional counseling.  (Ex. 15 (under seal).)

In enacting the federal statutes aimed at combatting the communication of threats through interstate commerce and against federal officials, Congress recognized the serious harm and

danger to other persons and the community that arises from even a singular communication of a threat to harm and kill—let alone the explicit, repeated, and specific threats of violence that the Defendant communicated to his victims in order to intimidate, terrorize, and instill fear.  This harm is felt not only by the victims targeted by the Defendant, but also the agencies that have to respond to these threats.   Special Agent Rowland's declaration describes the various steps that law enforcement must take in response to each threat that is received—responses that are heightened when a defendant such as this one purposefully sends his threats through an anonymous and encrypted email account.  (Ex. 13 ¶¶ 4-5.)  The resources diverted to respond to these threats tax the agencies' ability to focus on their critical missions (including fighting the COVID-19 pandemic) and take agents, investigators, analysts, and forensic examiners away from their regular assigned duties in order to both investigate these threats and provide various protective measures for the victims.  (*See id.*)

The seriousness of this offense and corresponding just punishment requires a significant sentence—one commensurate with the harm that the Defendant caused and sought to cause to his victims.

ii.     *History and Characteristics of the Defendant*

This offense was no momentary lapse in judgment for the Defendant.  The Defendant engaged in a pattern of communicating threatening messages to multiple victims over nine months. He used his technical skills gained by working for a number of technology companies to obtain an email account that he knew would make it harder for U.S. authorities to track and identify him. The Defendant argues that the COVID-19 pandemic and his estrangement from others, particularly his mother, resulted in his criminal behavior.  This is simply more rationalization by the Defendant to evade responsibility for the fact that what he was doing was stalking and hunting his victims in

order to intimidate and retaliate against them for their performance of their official duties to combat the COVID-19 pandemic—terrorizing them and their families with personalized threats of serious physical harm and death.

In contrast to the Defendant's attenuated timeline of lack of contacts with his mother, as the Government has set forth, each volley of threatening emails from the Defendant was precipitated by the victims having days previously engaged in their COVID-19 pandemic-related duties and the Defendant subsequently threatening the victims and their families with physical violence and death in retaliation.[5]  Importantly, the Defendant's explanation does not account for his threatening communications prior to the COVID-19 pandemic where none of the alleged stressors for his criminal conduct were present—stressors that millions of other individuals in the United States were subject to and they did not resort to the campaign of threats and terror inflicted by the Defendant on his victims.[6]

The Defendant's rationalization also does not explain his private correspondences showing his attempts to incite others against his chosen victims.  Consistent with his threats to Religious Leader A, the Defendant referenced the use of firearms to commit violence in his private communications with third parties.  (Ex. 10 (under seal).)  The Defendant also specifically referenced in his private communications the public targets to whom he had sent threatening emails, including Dr. Levine. (Ex. 11 (under seal).)  This conversation was with an individual

---

[5] The Defendant's explanation also does not account for the times in the text messages (particularly during January through March 2021) when he had trouble speaking with his mother and there is no evidence of corresponding threats.

[6] The Defendant's rationalization of his conduct also fails to explain why he sent threats of physical violence and death to a religious leader, a news reporter reporting on a recall election, or an Iranian American television host.  Similarly, the Defendant's use of antisemitic and transphobic language—particularly regarding Dr. Levine and in both the Defendant's threatening communications and private correspondence—shows that he targeted Dr. Levine for more than just her position as a state public health official in Pennsylvania.  (*See* Ex. 11.)

described by the Defendant's forensic psychologist (Dr. Travis Flower) as a longstanding friend of the Defendant.  (*Compare* Exs. 10, 11 *with* Def.'s Ex. B at 2.)  The Defendant's private email correspondence and his text messages also contained statements of incitement to violence against particular individuals and political groups, including the Defendant "calling for genocide" and "the need for direct militant action" with "lots of full autos" available in West Virginia, where he was residing at the time.  (Ex. 12 at 2-3 (under seal).)

In sum, the evidence—particularly the content of the Defendant's own threats—shows that the Defendant aimed to intimidate and retaliate against his victims for performing their official duties to combat the COVID-19 pandemic, because he did not agree with the positions these victims publicly espoused and to ensure that his victims were aware of these threats against themselves and their family members.  *See Stovall*, 817 F. App'x at 207-08 (noting that though defendant had a "modest criminal history" district court concluded that this did not off set "the 'substantial harm and fear to the victims in this case.'")

    iii.    *Deterrence, Just Punishment, and Respect for the Law Require a Significant Sentence*

The need to promote respect for the law, protect the public from further crimes of the Defendant, and afford adequate deterrence are paramount here.  The Defendant's conduct and his rationalization for his criminal activity—including his minimization of his graphic and violent threats by referring to them as "incendiary hyperbole"—demonstrate that a significant sentence is necessary to show this Defendant that any future attempts to communicate threats—either to others or public officials—will be met with severe consequences.  (*See* Def.'s Ex. A at 2.)

In light of the seriousness of the Defendant's offense, a below-Guidelines sentence would not serve as just punishment, promote respect for the law, or serve as adequate deterrence.  The cases set forth by the Defendant in his sentencing memorandum only serve to highlight the

comparative severity of his own conduct and the need for a significant period of incarceration. Most of these cases involve a defendant making singular threats with no attempt to conceal their identity.[7] *United States v. Mathur*, Crim. No. RDB-21-196, ECF No. 28 (July 9, 2021) (where defendant in the span of two minutes sent a web message and left a voicemail threatening the victim and used a phone number registered in his name to leave the voicemail, receiving a sentence of eight weekends and six months home detention); *United States v. Reed*, Case No. ELH-20-406, ECF No. 28 (June 22, 2021) (where defendant left one threatening letter on the door step of a resident of Frederick, Maryland, receiving a sentence of 7 months with 4 months home confinement); *United States v. Pierre-Louis*, Case No. 21-mj-109-TMD, ECF No. 29 (May 19, 2021) (defendant who posted threats to social media accounts he controlled, including a social media account in his own name, and posted an online fundraising assassination campaign to one of these social media accounts, receiving a sentence of fifty-two days); *United States v. Varnum*, Case No. RDB-19-337, ECF No. 42 (February 7, 2020) (defendant left singular voicemail with threats for a congressperson and used his own cellphone to make the threat, receiving a time served sentence of two days and six months home detention); *United States v. Conlon*, Case No. SAG-22-144, ECF No. 1 (January 20, 2022) (defendant left two tipline messages with the FBI containing threats that resolved to an IP address registered to the defendant's address or phone number, receiving a probation sentence of three years); *United States v. Scarborough*, Case No. 13-72, ECF No. 140 (M.D. Tenn. December 3, 2015) (defendant sent singular voicemail and email with threats,

---

[7] Some of the cases are also inapplicable. *See United States v. Mohr*, Case No. 21-mj-146-TMD, ECF No. 1 (Jan. 20, 2021) (where defendant made threats from Twitter account registered with email address in his name, posted a photograph of himself to the account, and posted a message using the account with his first name and that he resided in Maryland and case was dismissed with prejudice); *United States v. Harris*, Crim. No. GLR-21-390, ECF No. 24 (Feb. 7, 2022) (where defendant sent a singular threatening email from an email account using his own name and awaiting sentencing).

receiving eight months sentence); *United States v. Carlineo*, Case No. FPG-19-6140, ECF No. 1 (W.D.N.Y. March 10, 2020) (defendant left one threatening voicemail for congressperson identifying himself by name and when law enforcement went to speak with him he admitted to having a firearm in the residence, receiving 12 months and one day sentence.)

In contrast, where a defendant has communicated several threats, including to multiple victims, courts have generally sentenced these defendants significantly higher than the term of imprisonment requested by this Defendant. *See, e.g., United States v. Winegar*, Case No. SM-21-21, ECF No. 39 (D.N.H., December 2, 2021) (defendant left voicemails at the offices of six members of Congress with threats and sent an emailed threat to a New Hampshire State House of Representative, the voicemails and email address identified the defendant by name, and the defendant was sentenced to 33 months); *United States v. Tomasack*, Case No. GLR-18-552, ECF No. 14 (January 30, 2019) (defendant made telephonic threats to the Pentagon Tours Office and the CNN news affiliate in Atlanta, Georgia, and other private and government locations, and was sentenced to 21 months); *United States v. Hoff*, Case No. MHW-17-144, ECF Nos. 47, 49 (S.D. Ohio May 15, 2018) (sixty year-old defendant left threatening voicemails on congressman's office phone using the same phone number registered to him, made threats to the congressman's family, and the PSR determined he had a criminal history category of I, receiving above-Guidelines 40 months sentence); *United States v. Kabbaj*, Case No. 16-365, ECF No. 137 (E.D. Pa. May 2, 2017) (defendant sent multiple emails and made multiple court filings towards one U.S. Magistrate Judge and used a known email address he had used in various court filings, receiving 23 months sentence).

However, none of these cases involve the totality of aggravating circumstances of this Defendant's offense—multiple victims, over two dozen threatening emails sent over nine months,

the use of an anonymized encrypted email account from a foreign provider to hide his identity, and escalating conduct where the Defendant threatened not only his victims, but also their family members. *See United States v. Hoff*, 767 F. App'x 614, 625 (6th Cir. 2019) (affirming district court's above-guidelines sentence by noting that threats were not typical, as defendant had threatened victim's family, including their minor child, and the language used was "well beyond the pale"); *Stovall*, 817 F. App'x at 207 (noting and later affirming district court's determination that even though defendant had a modest criminal history and prior mental-health concerns, upward variance to 36 months was warranted because of the harm visited on victims and the vicious nature of the threats including to the victims' children). The egregiousness of the Defendant's conduct stands apart from other similarly charged defendants and the average sentences they received. These aggravating factors demonstrate how the Defendant's crime is far outside the "mine-run case" and certainly qualifies for a top end of the Guidelines sentence not only due to the seriousness of the Defendant's offense, but his own lack of respect for the law (as shown by the minimization of his conduct) and the need to provide specific and general deterrence.[8]

The need for general deterrence is particularly important in this case—one that has received significant national and international attention. Since March 2020, employees of the U.S.

---

[8] The Defendant also asks for a below Guidelines sentence based on the argument that he did not in fact commit a more serious crime—*i.e.,* that he did not plan to actually inflict the graphic violence he sent in his many threatening emails. If the Defendant had planned and taken steps to carry out his threats, he would have been charged with different and more serious statutes that would have reflected this aggravating conduct. In addition, the Guidelines would have applied a 6-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1). The Defendant's conduct fits squarely within the statute to which he has plead guilty and the Guidelines as calculated. No downward variance is appropriate because the Defendant did not commit additional criminal conduct. *See, e.g., United States v. Malik*, 16 F.3d 45, 52 (2d Cir. 1994) (finding that sentencing judge's consideration of the defendant's inability to carry out the threats was not a proper basis for downward departure); *United States v. D'Amario*, 350 F.3d 348, 357 (3d Cir. 2003) (same).

Department of Health and Human Services and NIH have received over 7,500 threats.  (Ex. 13 ¶ 3.)  A clear message is required that sending threats of serious bodily injury or death will be met with severe consequences.  *See Stovall*, 817 F. App'x at 207-08 (affirming district court's upward variance in threats case based on the need for general deterrence, even though the defendant had insignificant criminal history); *United States v. Scott*, 245 F. App'x 942, 945 (11th Cir. 2007) (affirming above-Guidelines sentence imposed by district court in case where defendant threatened to kill a federal judge and kidnap their children and where the sentencing judge noted in part that "the sentence would deter others from committing similar crimes.")  Such an important message would not be achieved by a time-served sentence of approximately one-year.

Finally, the Government believes that three years of supervised release is appropriate in this case.  The Defendant has been charged with using the Internet to send over two dozen threatening communications.  As recommendation by Probation, monitoring software for the full term of supervised release is necessary to ensure that a sufficient specific deterrent is in place and to protect the public from further crimes by this Defendant.  In his sentencing memorandum, the Defendant has withdrawn his objections to computer monitoring and mental health treatment.  (Def.'s Sentencing Memorandum n.24.)  The Government believes that Probation's recommended conditions should thus be imposed for a full three-year term of supervised release.

Accordingly, the Government submits that a sentence of 46 months in prison is sufficient, but not greater than necessary in light of the nature and circumstances of this serious offense, the need for just punishment, the Defendant's disrespect for the law, and the necessity of providing adequate specific and general deterrence.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of **46 months in prison, followed by 3 years of supervised release**, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:     ___/s/_____
        Rajeev R. Raghavan
        Jessica C. Collins
        Assistant United States Attorneys